UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

TERRY TYRONE PULLEN, JR.,

      **Plaintiff,**

                                        **Civil Action 2:14-cv-104**
      **v.**                                 **Chief Judge Edmund A. Sargus, Jr.**
                                          **Magistrate Judge Elizabeth P. Deavers**

C/O LISA HOWARD,

      **Defendant.**

## ORDER and REPORT AND RECOMMENDATION

Plaintiff, Terry Tyrone Pullen, Jr., an Ohio inmate who is proceeding without the assistance of counsel, brings this civil rights action under 42 U.S.C. § 1983 against Defendants, employees and former employees of the Ohio Department of Rehabilitation and Correction ("ODRC"),[1] alleging that he was subjected to excessive force in violation of the Eighth Amendment.  This matter is before the Court for consideration of Defendants' Amended Motion for Summary Judgment, Plaintiff's Motions to Compel, and the parties' briefing relating to these Motions.  (ECF Nos. 68, 76, 78, 79, 80, 81, 82, 88, 92, 93, 94, 95, and 98.)  For the reasons set forth below, it is **RECOMMENDED** that Defendants' Amended Motion for Summary Judgment be **GRANTED IN PART AND DENIED IN PART**.  In addition, Plaintiff's Motions to Compel are **DENIED AS MOOT**.

---

[1]Specifically, Plaintiff names corrections officers Lisa Howard, Andrew Fultz, Klinton Hill, Anthony Russell, Nathan Harris, David Rispress, Gleason (no first name provided), Newsome (no first name provided), Crystal Murphy, Church (no first name provided), R. Muphy, and C. Ackley.

## I.

The alleged events giving rise to this action occurred while Plaintiff was incarcerated at the Correctional Reception Center located in Harrisburg, Ohio.  The parties offer very different accounts of the events.  The Undersigned details the parties' differing accounts before setting forth the undisputed procedural background relating to this action, including Plaintiff's Rules Infraction Board ("RIB") and state-court convictions arising from these events.

### A.    Plaintiff's Account

#### 1.    Inside the Sally Port

According to Plaintiff's verified Amended Complaint (ECF No. 35), on July 9, 2013, Defendant Lisa Howard ordered him to step into a sally port in the B1 building upon his return from the medical bay.  After Plaintiff entered the sally port, Officer Howard hooked her left arm into his arm, started screaming, and applied physical force while electronically signaling for assistance.  Officer Howard then kicked the back of his left knee, forcing him onto one knee.

Plaintiff alleges that Defendant Fultz arrived and started punching him on the right side of his face and kicking his body while he was still on the floor.  He alleges that he shielded the left side of his face, "leaving only the rightside of [his] face exposed."  (Pl.'s Am. Coml. 6, ECF No. 35.)  Consistent with this allegation, in the signed testimonial statement he provided to the RIB, Plaintiff states that while on the floor with Howard, he "was covered up in the fetal position," which he says explains "why the other side of [his] face isn't f**ked up like the other side."  (Pl.'s RIB Testimonial Statement, ECF No. 92-1 at 7.)

Plaintiff alleges that Defendant Hill entered the sally port next and also began kicking and punching him.  According to Plaintiff, Defendants Harris, Rispress, and Russell subsequently arrived and also kicked and punched him.  Defendant Russell then began to twist

his ankles and bend his legs while someone else pressed on his back.  Defendants continued "for 5 min[utes] or longer," when Defendant Howard told the other corrections officers to stop because someone was coming.  (Pl.'s Am. Compl. 6, ECF No. 35.)  In an affidavit attached to his Memorandum in Opposition to Defendants' original Motion for Summary Judgment, Plaintiff represents that these officers continued to punch and kick him for five-to-ten minutes until Defendant Howard told them to stop because people were coming.  (Pl.'s Aff. 2, ECF No. 79-1.)

Defendants then placed Plaintiff in handcuffs and ankle shackles and stood him up. Defendants Hill and Harris held Plaintiff up against a wall while Officer Rispress punched him four times in the face while telling him to "go to sleep." (*Id*. at 2-3.)  Following the fourth punch, Defendants Newsome and Rispress led Plaintiff outside while Defendant C. Murphy watched.

In his Memorandum in Opposition the Defendants' original Motion for Summary Judgment, Plaintiff acknowledges that he "was manipulating his genitals through his pants" and "had his genitals exposed for a few brief seconds before entering the sally port." (Pl.'s Mem. in Opp. 3-4, ECF No. 79.)  He states that he did not, however, approach Defendant Howard "with his [genitals] out of his pants coming inside the sally port." (*Id*. at 9.)

### 2. **After Leaving the Sally Port**

Plaintiff alleges that he was then escorted to segregation by Defendants Newsome, Gleason, and Harris.  He represents that these officers bent his hands in one direction and his thumbs in another while tightening the handcuffs so that they cut into his wrists.  He alleges that as a result of the pain, he fell to his knees during the escort.  (Am. Compl. 7 at ¶ 33, ECF No. 35.)  Plaintiff represents that as Defendants Harris, Gleason, and Harris lifted him back on his feet, they told him "how [they are] going to cause [him] even more pain . . . once [he] got to

3

segregation."  (Pl.'s Aff. 3, ECF No. 79-1; Am. Compl. 7 at ¶ 33, ECF No. 34.)

Plaintiff represents that once he arrived "into segregation and through the sally port," Defendants Harris, Newsome, and Gleason "slammed [him] into a wall face first."  (*Id*.; *see also* Pl.'s Am. Compl. 6, ECF No. 35.)  He also states that Defendant Church was present.

Defendants R. Murphy and Ackley then took over his escort.  Plaintiff alleges that upon passing through the "s/c range door," Defendants Ackley and R. Murphy "slammed [him] face first into the floor and started punching and kicking [him]" and threating to kill him.  (Pl.'s Am. Compl. 6, ECF No. 35.)  In his affidavit, Plaintiff states that this application of force occurred in the presence of Defendant Church who then instructed Plaintiff to be placed in the strip cage. (Pl.'s Aff. 3, ECF No. 79-1.)  Plaintiff was then placed in the strip cage.

Plaintiff represents that a nurse examined him and told him that he only needed a bandaid.  He represents that his wrists were "cut and bleeding" and that he had injuries to his face.  (*Id*. at 3.)  He alleges that injuries to his wrists were caused by the corrections officers tightening his handcuffs "as tight as they would go while bending [his] wrist to add more pressure."  (Pl.'s Am. Compl. 8, ECF No. 35.)

Plaintiff attaches the Medical Exam Report from the date of the incident to his Memorandum in Opposition to Defendants' original Motion for Summary Judgment.  (ECF No. 79-1 at 2.)  The Medical Exam Report reflects that Plaintiff reported that a corrections officer grabbed him and then hit the "man down" alert.  (*Id*.)  Plaintiff complained that his wrists hurt. The examining nurse observed "slight swelling under [right] eye" and cuff marks on Plaintiff's wrists.  (*Id*.)  She ordered x-rays of Plaintiff's wrists in the morning.  Plaintiff alleges that he was unable to eat for three days because his jaw was sore and swollen.  (Pl.'s Am. Compl. 8, ECF No. 35; Pl.'s Aff. 4, ECF No. 79-1.)

4

Plaintiff represents that Lieutenant Murphy took pictures of his injuries.  He attaches these photographs as exhibits to his Memorandum in Opposition to Defendants' original Motion for Summary Judgment.  (Photographs 3-10, ECF No. 79-1.)  Defendants also provided these same photographs and subsequently re-submitted them in color and with better resolution.  (ECF Nos. 68-13 and 98-1.)  Consistent with the examining nurse's examination notes, review of the photographs shows some mild swelling and discoloration below Plaintiff's right eye, cuts on the sides of his wrists, and swelling in his hands.

**B.     Defendants' Account**

**1.     Inside the Sally Port**

According to Defendant Lisa Howard, Plaintiff initiated an interaction with her in the sally port.  Plaintiff exposed his penis, pushed her up against the wall of the sally port, forced her to the ground, and climbed on top of her body such that she was unable to move.  (Howard Aff. 3-5, ECF No. 68-4.)  When Plaintiff ignored her verbal directives to stop, she called for assistance.  Defendant Howard represents that the responding officers were eventually able to pull Plaintiff off of her.  She did not observe any of the responding officers punch or kick or slam Plaintiff against a wall.  As a result of this incident, Defendant Howard sustained several injuries, including a torn labrum, a torn rotator cuff requiring surgery, and a torn bicep.  (*Id*. at 11.)  Inmates Albert Clark and Harry Wood provided statements within the context of the Use of Force Committee's investigation that corroborate Defendant Howard's representations that Plaintiff exposed his genitals, attacked her, and held her down until other officers responded. (Use of Force Inmate Statements 21-21, ECF No. 68-13; Clark Decl. ¶¶ 1-3, ECF No. 68-16 (attesting that the statement contained in the Use of Force Inmate Statement he signed are true and accurate); Wood Decl. ¶¶ 1-3, ECF No. 68-17 (same).)

The responding officers also submitted affidavits corroborating Defendant Howard's account.  They indicate that when they arrived, Defendant Howard was on the floor and in distress and that Plaintiff was uncooperative.  They further represent that they did not witness any corrections officer punch or kick or slam Plaintiff against a wall.  (Gleason Aff. ¶¶ 3-5, ECF No. 68-1; C. Murphy Aff. ¶¶ 3-6, ECF No. 68-3; Harris Aff. ¶¶ 3-6, ECF No. 68-5.)  Defendant Fultz, who was the first to respond to Defendant Howard's screams, represents that Plaintiff ignored his multiple verbal orders to Plaintiff to cease and that he "employed several close fist strikes" to Plaintiff's lower back in order to get him to remove himself from on top of Defendant Howard.  (Fultz Decl. ¶¶ 3-5, ECF No. 98-2.)  When the other officers arrived, they were able to pull Plaintiff off of Defendant Howard and guide him to the sally port wall to be cuffed.  Plaintiff continued to resist.

There are no surveillance cameras recording the inside of the sally port or the segregation room.  Defendants have submitted video recordings from the surveillance cameras that record the exterior of the building.  (CRC Video B, lodged with Court as reflected in ECF No. 68-14.)  The video shows Plaintiff entering the building last behind other inmates.  He is visible for the last ten seconds before he enters the building and appears to be using his hand to manipulate his genitals through his pants during this time.  (*Id*. at 20:01:04-1:15.)  The video also demonstrates that only three minutes and five seconds elapsed from when Plaintiff entered the building and when he was escorted out.  (*Id*. at 20:01:15-20:04:20.)  In addition, in contrast with Plaintiff's representation that five-to-ten minutes elapsed between the time that the responding officers arrived and when he was escorted out of the building, the video reflects that only one minute and forty-two seconds elapsed.  (*Id*. at 20:02:38-20:04:20.)  The video shows three officers escorting Plaintiff for approximately fifty seconds before he is out of the scene.  The video does not show

the escorting officers kicking, punching, or otherwise applying unnecessary force during this portion of the transport.  (*See id*. at 20:04:21-20:05:09.)

### 2.    After Leaving the Sally Port

Defendant Gleason represents that Plaintiff "resisted . . . escort by refusing to walk and hold up his bodyweight, becoming 'deadweight,'" and ignoring multiple verbal directives to stand up.  (Gleason Aff. ¶ 8, ECF No. 68-1.)  He also stated that no officer kicked or punched Plaintiff during escort.  Defendant Harris consistently represents Plaintiff resisted escort and that as a result, he used "a modified wrist lock to prevent harm to [Plaintiff] and to compel his cooperation in his escort to segregation when he refused to move."  (Harris Aff. ¶¶ 8-9, ECF No. 68-5.)  He added that he did not observe any officer kick or punch Plaintiff during his escort to segregation.  The other officers who observed or assisted with Plaintiff's escort to segregation consistently represent that Plaintiff was uncooperative and that no officer kicked or punched him during escort.  (Church Aff. ¶¶ 3-10, ECF No. 68-6; R. Murphy Aff. 3-11, ECF No. 68-2.)

The DVD that Defendants manually filed with the Court contains several video clips taken from different cameras throughout the property that show portions of Plaintiff's journey from the B1 building to segregation.  (ECF No. 68-14.)  Most of Plaintiff's journey to the B1 building, where the incident with Defendant Howard occurred, can be observed by piecing clips from the various cameras together.  Significantly, none of the video clips show the escorting officers kicking, punching, or otherwise applying unnecessary force during Plaintiff's transport.  Video B, taken from an exterior camera, shows three officers escorting Plaintiff immediately after the incident from the B1 building for approximately fifty seconds before he is out of the scene.  (*Id*. at Video B, 20:04:21-20:05:09.)  Video C, taken from a different exterior camera, picks up approximately a minute after Video B drops off and shows the officers continuing their

7

escort to the segregation.  (*Id*. at Video C, 20:06:05-20:06:47; *see also* Camera D, 20:06:36–20:06:44 (showing same portion of this journey from a different exterior camera).)  Video E, taken from another exterior camera, shows another ten seconds of Plaintiff's journey to the segregation building and picks up fifteen seconds after Video C.  (*See id*. at Video E, 20:07:02-20:07:12.)  Video F, which picks up approximately thirty seconds after Video C, was recorded from a camera positioned directly outside the entrance to the segregation building.  (*Id*. at Video F, 20:07:45- 20:07:53.)  Video F shows the guards briefly placing Plaintiff up against the wall to open the door and then escorting him into the building.  Video Camera Twelve, which picks up Plaintiff's journey nineteen seconds after Video F, shows the officers briefly placing Plaintiff against the wall as he comes through the door into the segregation building before continuing their journey down a hallway.  (*See id*. at Video Camera 12, 20:08:11-20:08:44.)  Video Camera Eleven picks up where Video Camera Twelves ends and shows the officers escorting Plaintiff through a room inside the prison. (*Id*. at Camera 11, 20:08:43-20:08:50.)  Video Camera Five, which begins roughly ten seconds after Video Camera Eleven drops off, shows Plaintiff and his escorting officers enter through a doorway into another hallway.  Although the video image is of poor quality, Plaintiff appears to drop to the floor for roughly ten seconds before he is lifted and his journey appears to end.  (*See id*. at Camera 5, 20:09:01-20:09:24.)

## C.    Procedural History, Including the RIB and State-Court Convictions

As a result of the July 9, 2013 incidents discussed above, Plaintiff was charged with violating several institutional rules.  Following a hearing, the Rules Infraction Board ("RIB") found Plaintiff guilty of violating the following four institutional rules:

(3) Causing, or attempting to cause, *serious physical harm* to another.

*        *        *

8

(12)(a) Non-consensual sexual contact with another, whether compelled: (a) [b]y force . . . .

\*     \*     \*

(14) Seductive or obscene acts, including indecent exposure or masturbation; including, but not limited, to any word, action, gesture or other behavior that is sexual in nature and would be offensive to a reasonable person.

\*     \*     \*

(20) Physical resistance to a direct order.

O.A.C. 5120-9-06; (RIB Disposition, ECF No. 92-1 at 4-5, 9.)  In connection with their guilty verdict, the RIB made the following factual findings:

The board believes that the inmate did violate rules 3, 12(a), 14, and 20.  The board believes the inmate did pull his penis out and jump on top of the officer in an attacking manner.  Also the board believes the inmate did refuse to get off of the officer causing her to hit her head on the wall causing injury.  The board also believes the inmate did refuse all direct orders to get off of the officer and cuff up resulting in the use of force.

(RIB Disposition, ECF No. 92-1 at 5.)  The RIB sentenced Plaintiff to fifteen days in disciplinary control and recommended that his security level be reviewed.  (*Id.*).

On December 6, 2013, Plaintiff was indicted on felony assault charges brought by the Pickaway County prosecutor's office.  The sole count of the indictment alleged that Plaintiff caused or attempted to cause injury to Defendant Howard on July 9, 2013, in violation of Ohio Revised Code Section 2903.13(A).  (Dec. 6, 2013 Indictment, ECF No. 14-1).  On August 14, 2014, the Pickaway County prosecutor dismissed the charges and filed a *noelle prosequi*. According to Jayme Hartley Fountain, an assistant prosecutor for Pickaway County, the charges were dismissed in order to collect additional evidence against Plaintiff.  (Fountain Decl. ¶ 7, ECF 22-1).

Plaintiff filed this Section 1983 action on June 12, 2014, advancing excessive force claims against Defendants arising from the events occurring on July 9, 2013.  Plaintiff seeks

9

declaratory relief that his constitutional rights were violated, injunctive relief in the form of an order compelling his transfer to another prison and camera installation in sally ports, and monetary relief.

On September 11, 2015, Plaintiff was again indicted on felony assault charges brought by the Pickaway County prosecutor's office. (ECF No. 92-3.) The sole count in the Indictment provided as follows:

> <u>*COUNT ONE*</u>: **ASSAULT ON CORRECTIONS OFFICER**
>
> On or about the 9th day of July, 2013, at the county of Pickaway, or by some manner enumerated in Section 2901.12 of the Ohio Revised Code whereby proper venue is placed in the county aforementioned, Terry T. Pullen did knowingly cause or attempt to cause physical harm to Corrections Officer Lisa Howard, the said victim being an employee of the Department of Rehabilitation and Correction. Further, the offense was committed on the grounds of a state correctional institution, and the offense was committed by a person incarcerated in the state correctional institution;
>
> Contrary to and in violation of Section 2903.13(A) of the Ohio Revised Code and being a ***Felony of the Third Degree***, being against the peace and dignity of the state of Ohio.

(*Id.*) On March 9, 2016, Plaintiff entered a plea of "No Contest, with a Stipulation of Guilt," to the offense set forth in the indictment. (ECF No. 92-2.) In its March 10, 2016 Judgment Entry, the Court of Common Pleas for Pickaway County, Ohio indicated that it accepted Plaintiff's plea of No Contest after a hearing in which the state court explained to him that "such a plea is an admission of the truth of the facts alleged in the indictment . . . ." (*Id.* at 3.) The Pickaway County Common Pleas Court sentenced Plaintiff to nine months to be served consecutive to his original sentence. (*Id.* at 4.)

Defendants originally moved for summary judgment in December 2015, before Plaintiff entered and the state-court accepted his guilty plea. In their original motion, Defendants argue that Plaintiff has failed to produce sufficient evidence to create an issue of fact regarding whether

he was subjected to excessive force. (ECF No. 68.) Defendants maintain that instead, the evidence establishes that the force Defendants employed was applied in good faith to maintain control of the situation. Following the state-court's acceptance of Plaintiff's guilty plea, Defendants filed the subject Amended Motion for Summary Judgment, arguing that the United States Supreme Court's holding in *Heck v. Humphrey*, 512 U.S. 2364 (1994), operates to bar Plaintiff's claims against Defendant Howard and also the responding officers. (ECF No. 92.)

Plaintiff does not dispute that he pled guilty to the assault charges, but asserts that he did so because "it was in his best interest." (Pl.'s Mem. in Opp. to Am. Mot. for Summ. J. 5, ECF No. 94.) He explains that he "was being tried in a small town," that he did not have the evidence he needed, and that the state court was conspiring with the prosecutor's office and his own counsel to sabotage his trial. (*Id.* at 5-8.) He urges the Court not to apply *Heck*, citing his indigence and the unfairness of his conviction. (*Id.* at 9.) Relying on his own allegations and the photos of his injuries, Plaintiff maintains that summary judgment is not proper. Plaintiff further asserts that Defendants have failed to produce video footage that would corroborate his allegations that Defendant Howard called him into the sally port. He submits that the Court should therefore not issue a ruling in this case until Defendants have produced camera footage from the B-1 building.[2] (*Id.* at 16.) Plaintiff also acknowledges the RIB's conviction, but suggests that the RIB's findings are not fair because it relied upon conduct reports rather than "DVR footage from all angles." (*Id.* at 15-16.) He also posits that the RIB always finds inmates

---

[2] On this point, Defendants represent that Plaintiff was permitted to view all video footage recovered and that he and a witness signed a statement to this effect. (Defs.' Opp. To Pl.'s Mot to Compel 2-3, ECF No. 82). Defendants attached the signed statement, which reflects that Plaintiff reviewed a copy of the at-issue video surveillance. (Pl.'s Statement, ECF No. 78-5.) In addition, in Plaintiff's Reply in Support of his Motion to Compel, he acknowledged that he was permitted to review the video footage twice. (ECF No. 88 at p. 3.) As discussed above, the video footage that Defendants recovered was filed with the Court. (ECF No. 68-14.)

guilty when an inmate is accused of assaulting an officer.

## II.

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The moving party has the initial burden of proving that no genuine issue of material fact exists, and the court must draw all reasonable inferences in the light most favorable to the nonmoving party."  *Stansberry v. Air Wisconsin Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); *cf.* Fed. R. Civ. P. 56(e)(2) (providing that if a party "fails to properly address another party's assertion of fact" then the Court may "consider the fact undisputed for purposes of the motion").

"Once the moving party meets its initial burden, the nonmovant must 'designate specific facts showing that there is a genuine issue for trial.'"  *Kimble v. Wasylyshyn*, 439 F. App'x 492, 495–96 (6th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)); *see also* Fed. R. Civ. P. 56(c) (requiring a party maintaining that a fact is genuinely disputed to "cit[e] to particular parts of materials in the record").  "The nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts, . . . there must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute."  *Lee v. Metro. Gov't of Nashville & Davidson Cnty.*, 432 F. App'x 435, 441 (6th Cir. 2011) (internal quotation marks and citations omitted).  "When a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case, summary judgment is appropriate."  *Stansberry*, 651 F.3d at 486 (citing *Celotex*, 477 U.S. at 322–23).

12

# III.

As set forth above, Defendants maintain that Plaintiff's claims against Defendant Howard and the Defendants who initially responded to this incident are barred under *Heck v. Humphrey* and that the evidence they have offered establishes that they are entitled to summary judgment on the remaining claims.  This Court must, as a threshold matter, address Defendants' assertion that *Heck v. Humphrey* operates to bar these claims before evaluating whether genuine issues of fact preclude an entry judgment as a matter of law on any remaining claims and whether Defendants' are entitled to qualified immunity.  Last, the Undersigned considers the merits of Plaintiff's Motions to Compel.

## A.  Applicability of *Heck v. Humphrey*

In *Heck*, the United States Supreme Court held that, in assessing a claim under 42 U.S.C. § 1983, a court "must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence."  *Heck v. Humphrey*, 512 U.S. 477, 487 (1994).  If the claim would render a conviction or sentence invalid, "the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated."  *Id.*  Courts now refer to this requirement as the "favorable termination rule."

Here, Plaintiff has alleged that Defendants employed excessive force in violation of the Eighth Amendment.  Generally, "Eighth Amendment claims do not run afoul of *Heck* because the question of the degree of force used by a police or corrections officer is analytically distinct from the question whether the plaintiff violated the law."  *Huey v. Stine*, 230 F.3d 226, 230 (6th Cir. 2000), *overruled in part on other grounds by Muhammad v. Close*, 540 U.S. 749, 754–55 (2004);  *Swiecicki v. Delgado*, 463 F.3d 489, 493 (6th Cir. 2006), *abrogated on other grounds by Wallace v. Kato*, 549 U.S. 384 (2007) (noting that "a claim of excessive force does not

13

necessarily relate to the validity of the underlying conviction and therefore may be immediately cognizable" (citation omitted)). In other terms, "[w]here there is room for the facts alleged by the plaintiff and the facts essential to the judgment . . . to peacefully co-exist, the § 1983 [claim] must be allowed to go forward." *Lockett v. Suardini*, 526 F.3d 866, 873 (6th Cir. 2008) (internal citations and quotations omitted).

If, however, excessive force is an affirmative defense to the crime *or* the criminal provision makes the absence of excessive force an element of the crime, a criminal conviction would preempt § 1983 claims for excessive force arising from the same events. *Schrieber v. Moe*, 596 F.3d 323, 334 (6th Cir. 2010) (citations omitted); *Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 609 (6th Cir. 2014) ("[I]n this Circuit, if a plaintiff asserts a claim that contradicts an element of an underlying criminal offense, or if that claim could have been asserted in criminal court as an affirmative defense, *Heck* applies to bar the § 1983 suit."); *Parvin v. Campbell*, 641 F. App'x 446, 449 (6th Cir. 2016) (same). Courts must therefore "look both to the claims raised under § 1983 and to the specific offenses for which the § 1983 claimant was convicted." *Schrieber*, 596 F.3d at 334 (internal quotation marks and citation omitted).

### 1. Excessive Force Claims Against Defendant Howard

Applying the foregoing authority, the Undersigned concludes that if Plaintiff succeeds on his § 1983 against Defendant Howard, it would imply the invalidity of his state-court conviction. Both Plaintiff's conviction for assault and his excessive force claim against Defendant Howard arose out of the same July 9, 2013 incident and are therefore inextricably intertwined. Plaintiff could have raised excessive force as a defense to his assault charge, but instead entered a plea of No Contest with a Stipulation of Guilt. (Pl.'s March 9, 2016 No Contest Plea, ECF No. 92-2.) *See, e.g.*, *Cummings v. City of Akron*, 418 F.3d 676, 682-83 (6th Cir. 2005) (concluding Ohio

14

state-law assault conviction barred an excessive-force claim where the plaintiff had failed to raise the defense of excessive force because excessive force was available as a defense to the assault claim); *Anderson v. Weiner*, No. 1:14-cv-1597, 2015 WL 4546873, at *2, (N.D. Ohio July 28, 2015) ("By pleading guilty [to assault under Ohio law], plaintiff essentially conceded "the absence of excessive or unnecessary force." (internal quotation marks and citation omitted)); *Calixte v. Briggs*, No. 3:10-cv-2838, 2011 WL 4732852, at *1-2 (N.D. Ohio Oct. 5, 2011) (finding the plaintiff's § 1983 excessive force claims *Heck*-barred where he had entered an *Alford* plea to assault charges under Ohio law).  Consequently, Plaintiff cannot pursue a § 1983 against Defendant Howard without first demonstrating that "the conviction or sentence has already been invalidated."  *Heck*, 512 U.S. at 487.

Plaintiff's contention that the Court should decline to apply *Heck* in light of his indigence and the alleged unfairness of his state-court conviction is unavailing.  On this point, the *Heck* Court stated as follows:

> We hold that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.

512 U.S. at 486-87.  Plaintiff has offered no evidence demonstrating that he has successfully appealed his conviction or that it has been called into question by the issuance of a writ of habeas corpus.

It is therefore **RECOMMENDED** that the Court find Plaintiff's excessive force claim against Defendant Howard to be *Heck*-barred and grant summary judgment to her on this claim.

**2.      Excessive Force Claims Against Responding Defendants**

The Undersigned reaches a different conclusion, however, with regard to the responding officers.  Claims for excessive force are not subject to *Heck's* bar when the alleged excessive force was applied *after* the activity giving rise to the conviction.  *Sigley v. Kuhn*, Nos. 98–3977, 99–3531, 2000 WL 145187, at *4 (6th Cir. Jan. 31, 2000) (holding that excessive force occurring after the plaintiff's resistance and arrest would not necessarily imply the invalidity of the underlying conviction for resisting arrest); *Lassen v. Lorain Cnty., Ohio*, No. 1:13-cv-1938, 2014 WL 3511010, at *4 (N.D. Ohio July 14, 2014) ("*Heck's* bar does not apply when the alleged excessive force was applied *after* an arrest." (citing *Michaels v. City of Vermillion*, 539 F. Supp. 2d 975, 992 (N.D. Ohio 2008)).  Thus, "a court must carefully examine the facts and the temporal sequence of the underlying offense and the alleged unconstitutional conduct . . . ." *Hayward*, 759 F.3d at 612.

The Undersigned finds that Plaintiff's § 1983 claims against the responding officers do not constitute a collateral attack on his state-court conviction for assault on Defendant Howard. Plaintiff alleges that the responding officers employed excessive force *after* the activity giving rise to his conviction, namely, his struggle with Defendant Howard.  Thus, he could succeed on those claims without undermining his state-court assault conviction.  The Undersigned therefore concludes that Plaintiff's state-court conviction for assault does not bar his § 1983 claims against the responding officers pursuant to *Heck v. Humphrey*.

Defendants alternatively argue that Plaintiff's RIB conviction bars his claims against the responding officers under the *Heck* doctrine.  In support of this contention, Defendants point out that Plaintiff was convicted of physical resistance to a direct order under O.A.C. 5120-9-06 and that the RIB found that Plaintiff "did refuse all direct orders to get off of the officer and cuff up

16

resulting in use of force." (Defs.' Am. Mot. for Summ. J. 9-10, ECF No. 92 (citing RIB

Disposition, ECF No. 92-1 at 5).) Citing a trial court decision[3] relying upon *Bell v. Wilkinson*,

154 F. App'x 169 (2005), and Ohio Revised Code § 2967.19, Defendants contend that the RIB's

conviction "can undoubtedly impact [Plaintiff's] good time credit, parole potential, and judicial

release, all affecting the duration of his confinement under Ohio law." (*Id*. at 11.) The

Undersigned finds Defendants' alternative contention to be without merit.

The United States Supreme Court's decisions in *Edwards v. Balisok*, 520 U.S. 641

(1997), *Muhammad v. Close*, 540 U.S. 749 (2004), and *Wilkinson v. Dotson*, 544 U.S. 74 (2005),

read together, establish the boundaries of *Heck's* favorable termination rule as applied to prison

disciplinary proceedings. In *Edwards v. Balisok*, the United States Supreme Court extended

*Heck's* favorable termination rule to prison disciplinary proceedings where the proceedings

resulted in the deprivation of good-time credits and the inmate's allegations necessarily implied

the invalidity of the deprivation. 520 U.S. at 648.

In *Muhammad v. Close*, 540 U.S. 749 (2004) (per curiam), the Supreme Court reversed

the Sixth Circuit's application of *Heck* to prison disciplinary proceedings "in the absence of any

implication going to the fact or duration of any underlying sentence." 540 U.S. at 754. The

*Muhammad* Court noted that "although [administrative determinations] may affect the duration

of time to be served (by bearing on the award or revocation of good-time credits) that is not

necessarily so." *Id*. The Court went on to explain that because no good-time credits were

---

[3] Specifically, Plaintiff relies upon *dicta* in *Thompson v. Joseph*, No. 1:12-cv-992, 2014 WL
1685918 (S.D. Ohio Apr. 29, 2014). In *Thompson*, after concluding that the defendant was
entitled to summary judgment on the merits, the Magistrate Judge relied upon *Bell* to
alternatively recommend summary judgment in the defendant's favor "because Plaintiff's
requested relief would undermine the validity of his RIB conviction." *Id*. at *11. Notably, the
report and recommendation made no findings concerning whether the RIB's conviction impacted
the length of the inmate's conviction.

eliminated in that case, the inmate's § 1983 action could not "be construed as seeking a judgment at odds with his conviction or with the State's calculation of time to be served in accordance with the underlying sentence." *Id*. 754-55. The *Muhammad* Court therefore concluded the inmate had consequently not raised a claim "on which habeas relief could have been granted on any recognized theory" such that "*Heck's* favorable termination requirement was inapplicable." *Id*.

Finally, in *Wilkinson v. Dotson*, the Supreme Court more definitively outlined the contours of *Heck's* favorable termination rule within the context of an inmate's challenge to a prison's administrative proceedings. Focusing on its precedent, the *Wilkinson* Court concluded that "*Heck* specifies that a prisoner cannot use § 1983 to obtain damages where success *would necessarily* imply the unlawfulness of a (not previously invalidated) conviction or sentence." 544 U.S. at 81. Applying this principle, among others, the Court concluded that the inmates' challenges to their parole-eligibility proceedings under § 1983 were not *Heck*-barred where the inmates did not seek a speedier release into the community and where "a favorable judgment will not necessarily imply the invalidity of their convictions or sentences." *Id*. at 81-82 (internal quotation marks and citation omitted). In reaching this conclusion, the Court acknowledged that success on these claims could mean a speedier consideration of a new parole application in which the Ohio parole authorities could exercise their discretion to shorten the inmates' terms. *Id*. at 82. The *Wilkinson* Court also rejected the State of Ohio's invitation to extend *Heck's* application to parole proceedings on the grounds that these proceedings are part of an inmates' sentence that could have been invalidated had the inmate's § 1983 action been successful. The *Wilkinson* Court instead concluded that the term "sentence" as used in *Heck* referred to "substantive determinations as to the length of confinement." *Id*. at 83 (citation omitted). The Court explained that such an interpretation is consistent with the Court's holding in *Balisok*

because in that case, the Court "held the prisoner's suit *Heck*-barred not because it sought nullification of the disciplinary procedures but rather because nullification of the disciplinary procedures would lead necessarily to the restoration of good-time credits and hence the shortening of the prisoner's sentence." *Id*. at 84 (citation omitted).

Thus, read together, *Balisok*, *Muhammed*, and *Wilkinson*, establish that *Heck's* favorable termination rule does not apply to prison disciplinary proceedings unless (1) those proceedings resulted in affirmative action that necessarily impacted the length of confinement, and (2) the § 1983 claims the inmate seeks to assert, if successful, necessarily imply the invalidity of the affirmative action taken. *Cf. Taylor v. Lantagne*, 418 F. App'x 408, 411 (6th Cir. 2011) ("[T]he *Heck/Wilkinson* favorable termination rule only bars a § 1983 action when the civil rights action would necessarily challenge the validity of a prisoner's confinement or its duration." (citing *Wilkinson*, 544 U.S. at 81–82)).

Applied here, the Undersigned concludes that neither of these prerequisites are satisfied. First, as a result of the hearing, the RIB sentenced Plaintiff to confinement in disciplinary control for fifteen days. Although Defendants represent that that placement in disciplinary control *could* impact an inmate's good-time credit and parole potential, which *could*, in turn, affect the duration of an inmate's confinement, they offer no evidence to show that placement in disciplinary control *necessarily* has such an impact. Nor have Defendants provided any evidence that in this case, the RIB's sentence ultimately resulted in the elimination of Plaintiff's good-time credit or otherwise impacted the duration of his sentence. Because Defendants have offered no evidence reflecting that Plaintiff's placement in disciplinary control for fifteen days impacted the duration of his confinement, it follows that any collateral attack on the RIB conviction does not

19

necessarily imply the invalidity of his continuing confinement or imprisonment such that *Heck* does not apply.

Defendants' reliance upon Ohio Revised Code § 2967.19 fails to persuade the Undersigned to reach a different conclusion. Section § 2967.19 sets forth Ohio's Eighty Percent Release Procedure and provides that certain inmates may become eligible for judicial release "after having served eighty percent" of their prison term, which entails a hearing by the sentencing court in which that court retains discretion over whether to grant early release. Ohio Rev. Code § 2967.19. Although the statute reflects that the sentencing court will consider the "institutional summary report" that covers both "rehabilitative activities and any disciplinary action taken against the offender," it in no way compels the sentencing court consider any disciplinary action taken to be outcome-determinative. Ohio Rev. Code § 2967.19(D). Thus, even if the Court assumes that Defendants had demonstrated that Plaintiff is eligible for early judicial release under § 2967.19, because the sentencing court retains discretion over whether to grant release, *Heck* would not bar his § 1983 claims. *Cf. Muhammed*, 540 U.S. at 754-55 (holding that where "the Magistrate Judge expressly found or assumed that no good-time credits were eliminated" by the prison disciplinary board's action, the inmate's "§ 1983 suit challenging the action could not . . . be construed as seeking a judgment at odds with his conviction or with the State's calculation of time to be served in accordance with the underlying sentence"); *Wilkinson*, 544 U.S. at 82 (finding *Heck* inapplicable where success on the inmate's § 1983 claim "does not mean immediate release from confinement or a shorter stay in prison" even where it could have resulted in eligibility for a new parole hearing and a speedier consideration of a new parole application "at which Ohio parole authorities may" exercise their discretion to reduce the duration of confinement); *Taylor*, 418 F. App'x at 411 (relying on *Wilkinson* to conclude *Heck*

20

did not apply where inmate did not lose any good-time credits as a result of his misconduct violation conviction and instead only accrued "disciplinary time," removal of which would have only given him a cleaner recorder before the parole board).

Plaintiff's reliance upon *Bell v. Wilkinson*, 145 F. App'x 169 (2005), and trial courts relying upon *Bell* likewise fail to persuade.[4]  In *Bell*, the Sixth Circuit concluded that *Heck's* favorable termination rule would apply to an RIB conviction where the sentence involved confinement in disciplinary control.  157 F. App'x at 170.  The *Bell* Court reasoned that because prisoners confined in disciplinary control cannot earn good-time credits under Ohio Administrative Code § 5120-2-07(c)(1), RIB convictions resulting in confinement to disciplinary control do impact that duration of an inmate's confinement.  *Id*.  The *Bell* Court concluded that *Muhammad* therefore did not apply.  *Bell* is inapposite for several reasons.  First, Ohio Administrative Code § 5120-2-07(c)(1), does not apply to Plaintiff because he is imprisoned for offenses he committed after July 1, 1996.  *See* Ohio Admin. Code § 5120-2-07(J) ("This rule does not apply to any offense committed on or after July 1, 1996.").  Second, the *Bell* Court offered little analysis in support of its conclusion that *Muhammad* did not apply.  Third, the *Bell* Court issued its decision without consideration of the Supreme Court's decision in *Wilkinson*, an intervening case that issued just five months prior to *Bell*.  As discussed above, *Wilkinson* better defined the contours of the complicated jurisprudence surrounding *Heck's* application to prison

---

[4]Defendants also rely upon two other unreported cases from the Sixth Circuit, *Denham v. Shroad*, 56 F. App'x 692 (2003), and *Jennings v. Mitchell*, 93 F. App'x 723 (2004).  In both cases, the Sixth Circuit relied upon its earlier holding in *Huey v. Stine*, 230 F.3d 226 (6th Cir. 2000) to conclude that the inmate's § 1983 was *Heck*-barred because it would call into question the validity of his disciplinary conviction without consideration of whether the disciplinary convictions impacted the inmate's sentence.  As discussed above, however, in *Muhammad*, the Supreme Court expressly overruled *Huey's* holding that *Heck* applies categorically to all suits challenging prison disciplinary proceedings.  Thus, the Undersigned concludes that Defendants' reliance upon *Jennings* and *Denham* to be misplaced.

disciplinary proceedings.  Finally, in a recent, reported decision, *Peterson v. Johnson*, 714 F.3d

905 (6th Cir. 2013), the Sixth Circuit acknowledged, albeit in *dicta*, that *Heck* did not operate to

bar a § 1983 claim for excessive force under similar circumstances as are presented here,

reasoning as follows:

> [Heck's favorable termination] rule applies only where a prisoner's § 1983
> challenge "threatens . . . his conviction or the duration of his sentence."
> *Muhammad v. Close*, 540 U.S. 749, 751 (2004) (per curiam).  Peterson's
> challenge threatens neither.  He does not seek relief for any effect that the assault-
> and-battery conviction may have had on good-time credits nor does anything in
> the record show that good-time credits were implicated, and there is no indication
> that his underlying murder conviction or sentence is in any way affected by his
> claim. Instead, Peterson seeks solely financial damages for Johnson's alleged
> excessive force.  Thus, the *Heck/Edwards* rule has no relevance here.

*Id*. at 918.  Accordingly, in the absence of any evidence reflecting that Plaintiff's fifteen days in

disciplinary control lengthened his sentence, the Undersigned declines to rely upon *Bell* to

conclude that Plaintiff's § 1983 assault claims against the responding officers are *Heck*-barred.

Second, success on Plaintiff's excessive force claims does not necessarily imply the

invalidity of his RIB conviction.  Plaintiff does not seek expungement or reversal of his RIB

conviction.  Nor does he seek a speedier release from prison.  And like the inmate in *Peterson*,

Plaintiff does not challenge any effect that his conviction could have potentially had on any

accumulation of good-time credits.  Instead, Plaintiff seeks monetary relief for the excessive

force he alleges.  Moreover, the RIB's conviction of Plaintiff for "[p]hysical resistance to a direct

order," (RIB Disposition, ECF No. 92-1 at 5), does not necessarily compel the conclusion that

the responding officers did not employ excessive force.  Put another way, whether Plaintiff

resisted a direct order is analytically distinct from whether the responding officers responded

with excessive force such that "there is room for the facts alleged by [Plaintiff] and the facts

essential to the judgment of the [RIB] to peacefully co-exist."  *Lockett*, 526 at 873; *Peterson*, 714

22

F.3d at 917 ("[A]n assault-and-battery conviction is analytically distinct from an excessive force claim; a prisoner can commit the former and simultaneously be the victim of a guard's excessive force."); *see also Mitchell v. Craft*, No. 1:12–ccv–943, 2015 WL 4743045, at *4 (S.D. Ohio, Aug. 10, 2015) ("[E]ven if Plaintiff were the aggressor in the incident, *Heck* does not bar a § 1983 claim alleging that excessive force was used after the apparent need for force had subsided."); *Quinn v. Eshem*, No. 1:13-cv-864, 2015 WL 9951611, at *14 (S.D. Ohio Nov. 13, 2015) ("[T]he degree of force with which Defendants responded as they transported Plaintiff to multiple locations (aside from perhaps the first reactive use of O.C. spray by Officer Hale), is analytically distinct from Plaintiff's initial assault on Miller, and Plaintiff's excessive force claims would not necessarily undermine his disciplinary convictions for striking Miller.").

In sum, because Plaintiff's § 1983 claims against the responding officers, if successful, would not necessarily impact the fact or duration of his confinement, it is **RECOMMENDED** that the Court reject Defendants' argument that the claims are *Heck*-barred.

**B.     Merits of Remaining Excessive Force Claims**

The Court now considers Defendants' assertion that they are entitled to judgment as a matter of law with regards to Plaintiff's remaining excessive force claims.

"The Eighth Amendment prohibition on cruel and unusual punishment protects prisoners from the 'unnecessary and wanton infliction of pain.'"  *Barker v. Goodrich*, 649 F.3d 428, 434 (6th Cir. 2011) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).  "Whether [a defendant's] alleged conduct constitute[s] excessive force in violation of the Eighth Amendment depends on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'"  *Id.* (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)); *see also Roberson v. Torres*, 770 F.3d 398, 406 (6th Cir. 2014) ("Corrections officers do not violate

23

a prisoner's Eighth Amendment rights when they apply force in a good-faith effort to maintain or restore discipline." (internal quotation marks and citation omitted)).  Relevant factors in this analysis include "the extent of injury suffered by an inmate, the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Combs v. Wilkinson*, 315 F.3d 548, 556-57 (6th Cir. 2002) (internal quotation marks and citation omitted).

A claimant need not establish a "significant injury" to prove an excessive-force violation. *Wilkins v. Gaddy*, 559 U.S. 34, 37-40 (2010).  The Supreme Court, however, has cautioned that the extent of the injury is still meaningful in the analysis:

> This is not to say that the "absence of serious injury" is irrelevant to the Eighth Amendment inquiry.  [*Hudson*, 503 U.S. at 7]  "[T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." *Id*. (quoting *Whitley*, 475 U.S. at 321).  The extent of injury may also provide some indication of the amount of force applied.  As we stated in *Hudson*, not "every malevolent touch by a prison guard gives rise to a federal cause of action." 503 U.S. at 9.  "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id*. (some internal quotation marks omitted).  An inmate who complains of a "push or shove" that causes no discernible injury almost certainly fails to state a valid excessive force claim. *Id*. (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).

*Id*. at 37-38.

In the instant case, Plaintiff alleges several discrete instances of excessive force.  The Undersigned considers these alleged incidents in the order in which Plaintiff contends they occurred.

### 1.     The Responding Officers' Alleged Use of Force

The Undersigned finds that the officers who responded to the struggle between Plaintiff and Officer Howard are entitled to judgment as a matter of law with regards to the force they employed to bring Plaintiff under control.  The Undersigned reaches this conclusion because the threat reasonably perceived by the responding officers, together with the minor injury Plaintiff suffered, requires the conclusion that the responding officers' application of force did not rise to a level sufficient to sustain his § 1983 Eighth Amendment claims.

As discussed above, Plaintiff pled "No Contest, with a Stipulation of Guilt," to the state-court indictment for felony assault on Defendant Howard, with the effect being that he admitted of the truth of the facts alleged in the indictment.  (ECF Nos. 92-2 and 92-3.)  He is therefore precluded from arguing in this case that he did not assault Defendant Howard.  Thus, an assessment of whether the force Plaintiff alleges the responding officers employed was excessive begins with the premise that those officers were responding to Plaintiff's assault on Defendant Howard.  The undisputed evidence also reflects that Defendant Howard, a woman, sustained serious injuries as a result of Plaintiff's assault, including a torn labrum, a torn rotator cuff requiring surgery, and a torn bicep, which further demonstrates the gravity of the situation the responding officers encountered.  (*See* Howard Aff. 11, ECF No. 68-4.)  In *Griffin v. Hardrick*, 604 F.3d 949 (6th Cir. 2010), the Sixth Circuit explained the deference owed to a prison official's decision to employ force upon encountering a prison disturbance as follows:

> [O]fficials confronted with a prison disturbance must balance the threat [that] unrest poses to inmates, prison workers, administrators, and visitors against the harm inmates may suffer if guards use force.  Because prison officials must make their decisions in haste, under pressure, and frequently without the luxury of a second chance, we must grant them wide-ranging deference in the adoption and execution of policies that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.

604 F.3d at 954 (quoting *Combs*, 315 F.3d at 557 (citations and internal quotation marks

omitted)). Here, the undisputed evidence reflects that the responding officers reasonably

perceived a serious threat that necessitated utilization of force.

The Undersigned now considers "the extent of the injuries Plaintiff suffered," which

"provide[s] some indication of the amount of force applied," and also bears on whether the

officers employing the force "could have plausibly . . . thought [it] necessary." *Wilkins*, 559 U.S.

at 37-38 (citations and internal quotation marks omitted)). Plaintiff's allegation that the injuries

to his wrists were caused during his journey to segregation, (Pl.'s Am. Compl. 8, ECF No. 35),

means that the initial utilization of force resulted in only the injuries to his face. Plaintiff alleges

that in addition to swelling below his right eye, he also suffered a more serious jaw injury that

prevented him from eating for three days. His allegations of a serious jaw injury, however, are

neither supported by the evidence nor plausible for a number of reasons. First, the undisputed

photographic evidence upon which both Plaintiff and Defendants rely shows only minor swelling

and discoloration below his right eye, which Plaintiff alleges he suffered when the first

responder, Defendant Fultz, punched him in the face while he was still on the floor with

Defendant Howard. (*See* Photographs, ECF No. 79-1 at 3-10 and ECF Nos. 68-13 and 98-1;

Pl.'s Am. Coml. 6, ECF No. 35 (alleging that Defendant Fultz was the first individual who

entered the sally port and that he punched him on the right side of his face); Pl.'s RIB

Testimonial Statement, ECF No. 92-1 at 7 (acknowledging that only the right side of his face

was injured and that the injury occurred while he was laying on the floor in the sally port).)

Second, the Medical Exam Report Plaintiff included as an attachment reflects that he did not

complain of any jaw injury or jaw pain. (ECF No. 79-1 at 2.) Third, this same Medical Report

reflects that the examining nurse observed only "slight swelling under r[ight] eye" and that she

26

only recommended follow-up treatment for his wrists in the form of x-rays. (*Id.*) Finally, despite Plaintiff's allegations that he was unable to eat for three days due to the jaw injury, he did not seek follow-up medical treatment.

The swelling and discoloration below Plaintiff's right eye lend credibility to his allegations that Defendant Fultz, the first responding officer, punched him on the right side of his face. The absence of any evidence reflecting that Plaintiff sustained or complained of more significant injuries to the nurse, however, demonstrates that there are no genuine issues for tiral regarding his implausible allegations that he was kicked and punched for five-to-ten minutes and subsequently punched in the face four times before leaving the sally port. The irrefutable video evidence further discredits Plaintiff's allegations. As discussed above, in contrast to Plaintiff's allegations that the responding officers kicked and punched him for five-to-ten minutes, (Pl.'s Am. Compl. 6, ECF No. 35; Pl.'s Aff. 2, ECF No. 79-1), the video recordings from the surveillance cameras demonstrate that *only* one minute and forty-two seconds elapsed between when the responding officers arrived and when he was escorted out of the building. (CRC Video B, lodged with Court as reflected in ECF No. 68-14 at 20:02:38-20:04:20.) *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

In summary, accepting Plaintiff's plausible allegations as true and considering the gravity of the threat the responding officers reasonably perceived together with the minor injury Plaintiff sustained and the swiftness with which the responding officers entered and brought Plaintiff under control before emerging from the sally port, the Undersigned finds that the force utilized, including punching and kicking Plaintiff, was justified and reasonably "applied in a good-faith

effort to maintain or restore discipline," not "maliciously or sadistically to cause harm." *Whitley*, 475 U.S. at 319. Accordingly, it is **RECOMMENDED** that the Court conclude that the responding officers (Defendants Fultz, Hill, Harris, Rispress, Russell, Newsome, and C. Murphy) are entitled to summary judgment with regard to Plaintiff's § 1983 excessive force claims premised upon the utilization of force in the sally port.

The Undersigned further finds that Defendant C. Murphy, who Plaintiff represents watched him be led outside the sally port, is entitled to judgment in his favor for the additional reason that Plaintiff has failed to allege or offer any evidence showing that he is liable for excessive force under § 1983. In order to plead a cause of action under § 1983, a plaintiff must plead two elements: "(1) deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under color of state law." *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 534 (6th Cir. 2008) (citing *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 463 (6th Cir. 2006)). To sufficiently plead the second element, a plaintiff must allege "personal involvement." *Grinter v. Knight*, 532 F.3d 567, 575 (6th Cir. 2008) (citation omitted). This is because "§ 1983 liability cannot be imposed under a theory of *respondeat superior.*" *Id.* (citation omitted). Thus, to hold a supervisor liable under § 1983, a plaintiff "must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct . . . ." *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). Here, neither Plaintiff's Amended Complaint nor other any of the materials in the record provide sufficient factual content or context from which the Court could reasonably infer that Defendant C. Murphy was personally involved in any violation of Plaintiff's rights. Accordingly, for this additional reason, it is **RECOMMENDED** that Defendant C. Murphy be **DISMISSED WITH PREJUDICE**.

## 2.      The Escorting Officers' Alleged Excessively Forceful Handcuffing

As discussed above, Plaintiff alleges that after he was already handcuffed, shackled, and en route to segregation, Defendants Newsome, Gleason, and Harris bent his hands in one direction and his thumbs in another while tightening his handcuffs so that they cut into his wrists. As a result of the pain, Plaintiff screamed and dropped to his knees.  According to Plaintiff, as the officers lifted him back to his feet, they told him "how [they are] going to cause [him] even more pain . . . once [he] got to segregation."  (Pl.'s Aff. 3, ECF No. 79-1; Am. Compl. 7 at ¶ 33, ECF No. 34.)  The Undersigned concludes that viewing the facts in the lights most favorable to Plaintiff, material issues of fact preclude an entry of summary judgment in favor of Defendants Newsome, Gleason, and Harris with regard to this alleged handcuffing incident.

At this stage of the litigation, the parties genuinely dispute whether there was a need for the application of force.  According to Plaintiff, Defendants' bending and twisting of his fingers and excessive tightening of his handcuffs was unprovoked, and he dropped to his knees *after* the application of force due to the pain.  Defendants, on the other hand, maintain that "the overwhelming evidence demonstrates that Defendants were escorting a violent and uncooperative inmate who refused to hold up his body weight," (Defs.' Mot for Summ. J. 17, ECF No. 68), and that "Plaintiff dropped to deadweight several times during his escort from the B1 building to the segregation building," (Defs.' Reply in Support of Mot for Summ. J. 4, ECF No. 80).  Thus, Defendants maintain that Plaintiff dropped to his knees and became dead weight *before* they applied force.  Although Defendants did not offer Affidavits or Declarations disputing that they threatened Plaintiff with more pain as they lifted him back to his feet, they denied these allegations in their Answer to Plaintiff's Amended Complaint.  (Defs.' Answer ¶ 8, ECF No. 41.)  Thus, whether Defendants maliciously bent Plaintiff hands and thumbs while

29

excessively tightening his handcuffs in order to cause pain or employed this force in response to Plaintiff's resistance to escort is a genuine issue of material fact that a jury must decide.

Defendants' assertion that that summary judgment in their favor is warranted with regard to this alleged incident because "Plaintiff has failed to put forth any evidence showing that excessive force was used against him in violation of the Eighth Amendment," (Defs.' Reply in Support of Mot for Summ. J. 4, ECF No. 80), lacks merit.  To begin, Plaintiff's Amended Complaint supports his allegations and is verified.  (ECF No. 35.)  Because it is verified, it can be relied upon at the summary judgment stage to assert that a fact is genuinely disputed.  *See El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008) ("His verified complaint therefore carries the same weight as would an affidavit for the purposes of summary judgment." (citation omitted)); *Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993) ("[S]ince [the plaintiff] filed a verified complaint his allegations 'have the same force and effect as an affidavit' for purposes of responding to a motion for summary judgment." (quoting *Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992)).  In addition, the affidavit Plaintiff attached to his Memorandum in Opposition to Defendants' Motion for Summary Judgment also supports his allegations.  (ECF No. 68-2.)  Plaintiff's signed testimonial statement to the RIB in which he represents that during his journey to escort, despite "follow[ing] their rules," they applied a wrist lock with so much pressure that he was screaming and fell to his knees further supports his allegations.  (Pl.'s RIB Testimonial Statement, ECF No. 92-1 at 7.)  The photographs, which reflect cuts on Plaintiff's wrists and swollen hands likewise provide some evidence regarding his allegations concerning the extent of the force employed. (*See* Photographs, ECF No. 79-1 at 3-10 and ECF Nos. 68-13 and 98-1); *Cf. Morrison v. Bd. of Tr.'s of Green Twp.*, 583 F.3d 394, 402–03 (6th Cir. 2009) (finding, within context of a Fourth Amendment excessive force handcuffing claim, that

allegations of bruising and wrist marks create a genuine issue of material fact).  The Medical

Exam Report Plaintiff offered, which reflects that he complained of wrist pain and that the nurse

observed "cuff marks" on both of his wrists further supports his allegations.  (ECF No. 79-1 at

2.)  Finally, although the video footage is incomplete and of poor quality, it does not support

Defendants' assertion that they were "escorting a violent and uncooperative inmate who refused

to hold up his body weight," (Defs.' Mot for Summ. J. 17, ECF No. 68), or that "Plaintiff

dropped to deadweight several times during his escort," (Defs.' Reply in Support of Mot for

Summ. J. 4, ECF No. 80).  (*See* Manually filed DVD, ECF No. 68-14 at Videos B, C, D, F, 12,

11, and 5.)

In sum, Plaintiff has satisfied his burden of demonstrating that genuine issues of fact exist

for trial and that a reasonable jury could return a verdict in his favor with regards to his claim of

excessive force premised upon his allegations that Defendants Newsome, Gleason, and Harris

bent his hands in one direction and his thumbs in another while tightening his handcuffs so that

they cut into his wrists.  It is therefore **RECOMMENDED** that the Court **DENY** summary

judgment to Defendants Newsome, Gleason, and Harris with regards to Plaintiff's § 1983 claims

premised upon these allegations.

### 3.    The Escorting Officers' Alleged Continued Use of Force

The Undersigned reaches the opposite conclusion, however, with regard to the incidents

of force Plaintiff alleges occurred subsequent to the handcuffing incident.  According to Plaintiff,

after the handcuffing incident, he was subjected to excessive force when Defendants Harris,

Newsome, and Gleason slammed his face into a wall, (Pl.'s Aff 3, ECF No. 79-1; Pl.'s Am.

Compl. 6, ECF No. 35), and again after Defendants Murphy and Ackley took over his escort

when they purportedly slammed his face into the floor and punched and kicked him while

threatening to kill him. (Pl.'s Am. Compl. 6, ECF No. 35.). No reasonable jury could believe these assertions in view of the record evidence.

As discussed above, the record evidence reflects that beyond the injuries to his wrists (which Plaintiff alleges occurred during the excessively forceful handcuffing incident), he suffered only the injury below his right eye, which he alleges occurred when Defendant Fultz punched him in the sally port. Although a claimant is not required to show that he suffered a significant injury to prove an excessive-force violation, the absence of any record evidence reflecting that Plaintiff suffered any additional discernable injury from these alleged incidents of force belies his allegations that his face was slammed into a wall and again into the floor and that he was subsequently punched and kicked. *See Wilkins*, 559 U.S. at 38 ("An inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." (internal quotation marks and citation omitted)); *Richmond v. Settles*, 450 F. App'x 448, 454 (6th Cir. 2011) ("Every malevolent touch by a prison guard does not give rise to an Eighth Amendment cause of action and a prisoner must allege that he sustained more than *de minimis* injury in order to state a viable excessive force claim." (citations omitted)); *Corsetti v. Tessmer*, 41 F. App'x 753, 755 (6th Cir. 2002) ("[C]onsistent with Eighth Amendment jurisprudence, the predicate injury need not be significant, but must be more than *de minimis*." (citations omitted)); *Rogers v. Shostak*, No. 1:14-cv-213, 2015 WL 3604057, at *8-9 (S.D. Ohio June 5, 2015) (granting summary judgment and explaining that even if the Court accepted as true that the inmate was pushed and punched "hard" on his chest, the record reflected that despite his allegations of chest pain, there was "no evidence that plaintiff suffered a chest injury or chest pain of sufficient severity to require any type of medical attention or treatment").

As discussed above, Plaintiff did not report these alleged assaults nor complain of any injuries beyond the cuts on his wrist and the swelling below his right eye when he saw the nurse. (Medical Exam Report, ECF No. 79-1 at 2.)  Nor did the nurse identify any additional injury. (*Id*.)  Further, the record does not reflect that Plaintiff sought follow-up medical treatment. Indeed, Plaintiff fails to identify what injuries he sustained as a result of these alleged incidents of force that were separate from and additional to the injuries he alleges he sustained in the sally port.  Moreover, Plaintiff failed to even mention these alleged incidents in his signed Testimonial Statement to the RIB.  (ECF No. 92-1 at 7.)  Finally, although the video footage is incomplete and therefore does not rule out the possibility that the alleged incidents could have occurred during periods where Plaintiff's journey was not captured, the footage that was recovered offers no support for Plaintiff's allegations.  (*See* Manually filed DVD, ECF No. 68-14 at Videos B, C, D, F, 12, 11, and 5.)

Because the record fails to reflect that Plaintiff suffered any injury as a result of these alleged incidents of force, and because it defies commonsense that he would suffer no injuries as a result of his face being slammed into a wall and again into the floor before being punched in kicked, the Undersigned concludes that Plaintiff has failed to come forward with evidence beyond his implausible allegations to refute Defendants' evidence.  *See Scott*, 550 U.S. at 380-81.  It is therefore **RECOMMENDED** that the Court conclude that Defendants are entitled to summary judgment on Plaintiff's excessive force claims premised upon his allegations of the escorting officers' continued use of force.

The Undersigned further concludes that Defendant Church is entitled to judgment in his favor for the additional reason that Plaintiff failed to offer evidence or even sufficiently allege that he is liable for excessive force under § 1983.  Instead, Plaintiff alleges, without more, that

some of the incidents of force occurred in his presence.  (Pl.'s Aff. 3, ECF No. 79-1.)  As

discussed above, "§ 1983 liability cannot be imposed under a theory of *respondeat superior*."

*Grinter*, 532 F.3d at 575.  Thus, for this additional reason, it is **RECOMMENDED** that

Defendant Church, like Defendant C. Murphy be **DISMISSED WITH PREJUDICE**.

**C.**      **Qualified Immunity**

       Defendants submit that they are "entitled to qualified immunity as they had a good faith

reasonable belief that their actions were necessary to protect a correctional officer and restore

order."  (Defs.' Mot. Summ. J. 18, ECF No. 68.)

       "Qualified immunity shields an officer from suit when he or she makes a decision that,

even if constitutionally deficient, reasonably misapprehends the law governing the circumstances

that the officer confronted."  *Roberson*, 770 F.3d at 406 (citing *Brosseau v. Haugen*, 543 U.S.

194, 198 (2004)).  "In determining whether qualified immunity applies, the court employs a two-

part test, asking (1) whether, considering the allegations in a light most favorable to the party

injured, a constitutional right has been violated, and (2) whether that right was clearly

established."  *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009) (citations and quotation and

alteration marks omitted).

       The Undersigned need only address Defendants' assertion of qualified immunity as it

relates to Plaintiff's claims premised upon his allegations that after he was already handcuffed,

shackled, and en route to segregation, Defendants Newsome, Gleason, and Harris bent his hands

in one direction and his thumbs in another while tightening his handcuffs so that they cut into his

wrists.  With regard to this incident, Defendants assert that "[w]hen escorting Defendants took

the uncooperative Plaintiff to segregation, they reasonably believed that grabbing his wrists to

prevent him from falling was lawful and necessary in order to transport him."  (*Id*. at 20.)

Defendants' claim of qualified immunity is impermissibly premised upon their version of the highly disputed facts. At the summary judgment stage, however, this Court must view the facts in the light most favorable to Plaintiff as the non-moving party. *Stansberry*, 651 F.3d at 486. As discussed above, whether Defendants maliciously bent Plaintiff hands and thumbs while excessively tightening his handcuffs in order to cause pain remains a genuine issue of material fact. Because it is well settled that inmates have a constitutional right to be free from the unnecessary and wanton infliction of pain, Defendants are not entitled to qualified immunity at this juncture. *See Barker*, 649 F.3d at 434 (Eighth Amendments protects inmates from the "unnecessary and wanton infliction of pain" (internal quotation marks and citation omitted)); *see also Johnson v. Perry*, 106 F. App'x 467, 469 (6th Cir. 2004) ("An unprovoked application of force to a handcuffed and shackled prisoner would violate clearly established law under the Eighth Amendment.") Accordingly, it is **RECOMMENDED** that Defendants' request for qualified immunity be **DENIED**.

## D.      Plaintiff's Motions to Compel

As a threshold matter, the Court **DENIES** Plaintiff's Motions to Compel (ECF Nos. 76 and 81) because he failed to include a certification that he has attempted to confer in good faith with Defendants regarding the document requests at issue. As this Court advised in its December 17, 2015 Order denying Plaintiff's earlier-filed Motion to Compel without prejudice:

> Federal Rule of Civil Procedure 37 permits a party to file a motion for an order compelling discovery if another party fails to respond to discovery requests, provided that the motion to compel includes a certification that the movant has, in good faith, conferred or attempted to confer with the party failing to respond to the requests. Fed. R. Civ. P. 37(a)(1).
>
> This requirement is not waived simply because the moving party is an inmate proceeding without counsel. *See, e.g., Hughes v. Lavender*, No. 2:10-cv-674, 2011 WL 1233481, at *3 (S.D. Ohio Mar. 29, 2011) (denying *pro se* inmate's motion to compel without prejudice to renewal after Rule 37(a)-

mandated conference had occurred and inmate made requisite certification); *Sneed v. Moore*, No. 1:09-cv-043, 2009 WL 3599476, at *1 (S.D. Ohio Oct. 26, 2009) (denying pro se inmate's motion to compel, in part, because he failed to conclude a certification of good faith pursuant to Rule 37(a)); *Lewis v. Randle*, No. C2-01-161, 2002 WL 483542, at *2 (S.D. Ohio Mar. 13, 2002) (same); see also *Rones v. Schrubbe*, 451 F. App'x 585, 587 (7th Cir. 2011) (affirming trial court's denial of pro se inmate's motion to compel on the grounds that he failed to comply with Rule 37(a)'s requirement that he certify that he had conferred with the opposing party).

(Dec. 17, 2015 Order, ECF No. 65.)

Notwithstanding this deficiency, review of the Motions to Compel reveals that the information Plaintiff seeks to obtain through his pending Motions to Compel would not alter the Undersigned's foregoing recommendations. Thus, Plaintiff's Motions to Compel are alternatively **DENIED AS MOOT**.

For example, Plaintiff seeks to compel production of video footage that he maintains will corroborate his allegations that Defendant Howard called him into the sally port. As discussed above, Plaintiff acknowledges that he has had the opportunity to review the subject footage twice. In addition, Defendants have filed all recovered video footage with the Court. (ECF No. 68-14.) With regard to the claims for which the Undersigned recommends judgment in Defendants' favor, the video evidence does not support Plaintiff's alleged version of the events. Moreover, as discussed above, his claims against Defendant Howard are *Heck*-barred. For this same reason, Plaintiff's request for an order compelling production of Defendant Howard's medical records lacks relevance.

In addition, Plaintiff asks this Court to compel a copy of the building B-1 inmate cell location roster from July 9, 2013. Defendants have represented, however, that no such roster exists. As Defendants point out, they do not have a duty to create documents that do not exist simply to comply with a discovery request. *See Miller v. Experian Info. Solutions, Inc.*, No.

3:13-cv-90, 2014 WL 5513477, at *2 (S.D. Ohio Oct. 31, 2014) (collecting cases establishing that "[p]arties have no duty to create documents simply to comply with another party's discovery request."); *see also Brown v. Warden Ross Corr. Inst.*, No. 2:10–cv–822, 2011 WL 1877706, at *5 (S.D. Ohio May 16, 2011) ("Defendants have represented that they do not have the information Plaintiff seeks. The Court cannot require them to produce what they do not have.").

Defendants' objection to Plaintiff's request for all disciplinary reports, informal complaints, and grievances relating to all Defendants on the grounds that the request lacks relevance, is overbroad, is unduly burdensome, and potentially implicates confidentiality interests is sustained. *Brooks v. Yates*, No. 1:09-cv-922, 2011 WL 6257684, at *1 (S.D. Ohio Dec. 15, 2011) (sustaining correction officers objection to inmate's request for production of officer's disciplinary records on grounds of relevancy and overbreadth where inmate sought records to demonstrate that the officers had a history of violent acts).  Defendants' objection to Plaintiff's request for the names of all of Defendants' family members is likewise sustained on relevance grounds.

In sum, Plaintiff's Motions to Compel are **DENIED**, and the Clerk therefore is directed to remove ECF Nos. 76 and 81 from the Court's pending Motions list.

### IV.

For the reasons set forth above, it is **RECOMMENDED** that Defendants' Amended Motion for Summary Judgment (ECF No. 92) be **GRANTED IN PART AND DENIED IN PART** as detailed herein.  In addition, Plaintiff's Motions to Compel (ECF Nos. 76 and 81) are **DENIED**, and the Clerk therefore is directed to remove ECF Nos. 76 and 81 from the Court's pending Motions list.

## PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

**IT IS SO ORDERED.**


Date:  September 13, 2016                    /s/ *Elizabeth A. Preston Deavers* _ _
                                             ELIZABETH A. PRESTON DEAVERS
                                             UNITED STATES MAGISTRATE JUDGE